# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ALEXSAM, INC.,
*Plaintiff*,

v.

No. 3:19-cv-01025 (VAB)

AETNA, INC.,
*Defendant.*

## RULING AND ORDER ON MOTION TO DISMISS

AlexSam, Inc. ("Plaintiff" or "AlexSam") has sued Aetna, Inc. ("Aetna" or "Defendant") for patent infringement related to Claims 32 and 33 of United States Patent Nos. 6,000,608 (the "'608 Patent"). Second Am. Compl., ECF No. 57 (Dec. 6, 2019). Aetna has moved to dismiss the Second Amended Complaint. Mot. to Dismiss, ECF No. 65 (Jan. 10, 2020).

For the following reasons, the motion to dismiss is **GRANTED**.

AlexSam may move for leave to file an amended pleading by **October 9, 2020,** to the extent the deficiencies identified in this ruling can be addressed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

#### 1.  The Patent

AlexSam brings this patent infringement action "related to Claims 32 and 33 of Plaintiff's United States Patent Nos. 6,000,608, entitled '*Multifunction Card System*,' [or the '608 patent'] . . . . Specifically, [ ] that Defendant provides to its customers with a medical card . . . for use in a multifunction card system that operate on the VISA and MasterCard Networks."

1

Second Am. Compl., ECF No. 57 ¶ 1 (Dec. 6, 2019) ("SAC") (emphasis in original). Claim 32 states:

> A multifunction card system comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a baking network;
>
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
>
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card function as a debit card and said processing hub accessing a second database when the card functions as a medical card.

Ex. A., ECF No. 57-1 at A-11 (Dec. 6, 2019) ("Patent 6,000,608"). Relatedly, Claim 33 states: "The multifunction card system of claim 32, wherein the unique identification number further compromises a medical identification number." *Id.*[1]

The '608 Patent "was duly and legally issued by the United States Patent and Trademark Office ('USPTO') on December 14, 1999" and "was assigned to AlexSam, Inc. in 2003." SAC ¶¶ 13–14. On July 10, 2012, "[a]n *ex parte* Reexamination Certificate was issued . . . which re-affirmed a number of the claims of the '608 Patent," excluding Claims 32 and 33. *Id.* ¶ 16. "The primary purpose of the '608 Patent [allegedly] is to implement a multifunction card system, such as one that utilizes a rechargeable pre-paid card, a pre-paid card with a loyalty function, or a medical information card that will perform as [a] normal bank card . . . to purchase goods and

---

[1] The Court considers the '608 Patent to be a system claim. System claims "seek to patent 'several components that are used "collectively" to achieve a particular result,' and so they are often held to protect tangible items." *Captan AG Sys., Inc. v. Raven Indus., Inc.*, 228 F. Supp. 3d 1235, 1241 n.6 (D. Kan. 2017) (quoting Stephen P. Cole, *NTP v. Rim: The Diverging Law Between System and Method Claim Infringement*, 5 Pierce L. Rev. 347, 353 (2007)).

services." *Id.* ¶ 17. The inventor, Robert Dorf, allegedly sought to invent "a multifunction card system that utilized his special-purpose computer, referred to as the Processing Hub, that worked with the existing banking network and that utilized a bank identification number (BIN) to allow for the use of a multi-function card." *Id.* ¶¶ 13, 21. He allegedly "invented a new computer to avoid the limitations of the conventional systems at the time." *Id.* ¶ 22. "The '608 Patent [allegedly] provides practical technological solutions to specific problems" in point-of-sale devices and banking networks by providing "a technological solution to the existing challenges by offering a multifunction card system that (1) did not have the security problems of pre-activated cards, (2) did not require special hardware for the merchant, and (3) provided all the convenience to consumers of normal bank cards." *Id.* ¶¶ 25–26.

>    AlexSam alleges that:
>
>> [t]he primary innovative feature offered by '608 Patent was to introduce a Processing Hub that: (1) operates as a compatible component of a banking network; (2) communicates with the retailers to perform the specialized multi-card transactions (such as activating the card); (3) allows these specialized functions to be performed on an existing unmodified POS device, and (4) does not interfere with normal debit/credit card functions for purchasing of goods and services at any merchant POS device.

*Id.* ¶ 27. Allegedly, "[a] unique, novel, and inventive concept of the '608 Patent is the implementation of a new Processing Hub within a banking network and the intelligence of the Processing Hub can manage the different functions of each account," *id.* ¶ 28; "[a] Processing Hub that [allegedly] is 'transparent' to the POS device, yet still intercepts and processes all the specialized transactions necessary to support multifunction cards, and still allow[s] merchants to keep their same POS devices," *id.* ¶ 29.

>    Mr. Dorf's invention allegedly "'serves as the nerve center of the system 108.' The Processing Hub . . . connect[s] to 'any given POS device 105' which allows a retailer to use 'the

system 108 . . . to remotely activate or add value or loyalty data to a system card.'" *Id.* ¶ 30. His solutions allegedly are "more technically difficult to implement . . . due to the specific components that must be integrated with a banking network and still maintain the compliance of the highly regulated transaction process." *Id.* (citations omitted).

While allegedly more technically complicated, "the '608 Patent is more viable to merchants, more marketable, and more user acceptable in the marketplace," *id.*, because it allegedly "addresses specific technical problems and limitations with prior art card systems," *id.* ¶ 31.[2] The '608 Patent allegedly also "describes enhancements to incentivize customers to use specific cards and/or purchase specific products and/or purchase at specific merchants using loyalty cards, by establishing a centralized database to automatically track 'loyalty points.'" *Id.* ¶ 32. Mr. Dorf allegedly provided a solution to the various technological problems "by inventing new cards, new devices, and a new system." *Id.* ¶ 33.

The Processing Hub allegedly "accepted transactions from retailer POS devices for the multifunction cards, such as card activation or recharge, and processed and/or transmitted those transactions in order to complete (authorize) those transactions or reject them if not valid." *Id.* ¶ 34. Another allegedly critical component of Mr. Dorf's system is the banking network, as "the card transaction [must] be transmitted to the Processing Hub, [and] also to other banks and financial institutions that must participate in these transactions." *Id.* ¶ 36. Specifically, "the combination of the unmodified pre-existing standard point-of-sale device, transaction processor, and Processing Hub into a system that allows for the multifunction card system to access debit

---

[2] The limitations allegedly occur in three areas: "(1) existing credit and debit cards could only perform a very limited set of electronic transactions; (2) the pre-paid aspect of these debit cards created security problems in stores, which required them to be activated electronically after they were purchased; and (3) there was no centralized processing center to handle the specialized transactions of these multi-function cards." SAC ¶ 31.

card databases and medical databases [allegedly] was not generic or conventional in 1997." *Id.*
¶ 37.

Claims 32 and 33 are allegedly "tied to a particular machine – the Processing Hub – and
machine system – the multifunction card system." *Id.* ¶ 38. They allegedly "made possible the
use of multifunction cards without the need for separate, stand-alone system and equipment
thereby solving a technical problem within the medical goods and services industry." *Id.* ¶ 40.
AlexSam alleges that "Claims 32 and 33 of the '608 Patent include a Processing Hub that was
not previously available in the industry." *Id.* Specifically, the patented system was not available
in the medical goods and services industry until 2003 or 2004; meaning "[Mr. Dorf's] invention
[allegedly] pre-dated by many years the flexible spending account (FSA) and health savings
account (HSA) products that are offered today." *Id.* ¶ 41.

From 1997 until 2003, Mr. Dorf allegedly "practiced his inventions and met with major
retailers, MasterCard, Visa, Discover, health plans and doctors in an effort to connect them to his
Processing Hub." *Id.* ¶ 42. In fact, in 1997, FSAs and HSAs allegedly "were several years away
from being introduced or even permitted." *Id.* ¶ 46.

After receiving his patents, Mr. Dorf allegedly created a business, Intelligent Card
Solutions, Inc. (ICS), "which offered a processing platform to process transactions for Michigan
National Bank, MCI[, . . . he [allegedly] had a joint venture with Mr. Ron Lauder of RSL
company[,] [and he] also owned a BIN from MasterCard." *Id.* ¶ 43. The "Processing Hub with
ICS [allegedly] allowed his company to process different types of card products and transactions,
such as phone cards, health cards, and gift cards." *Id.* ¶ 44.

After working to build his business, Mr. Dorf allegedly "was unable to compete with
larger companies." *Id.* ¶ 48. He allegedly "founded AlexSam in 2003 to which was assigned all

rights to enforce the '608 Patent." *Id.* ¶ 48. AlexSam allegedly "has licensed the AlexSam Patents to Humana, WEX Health (formerly, Evolution Benefits) and Unitedhealthcare in the medical card industry." *Id.* ¶ 49.

### 2. Aetna, Inc.

Aetna allegedly "owns, operates, advertises, and/or controls the website, www.aetna.com" and "sells, advertises, offers for sale, uses, or otherwise provides, . . . Health Savings Account ("HSA") Visa Debit Cards, Flexible Spending Account ("FSA") Visa Debit Cards, Health Reimbursement Account ("HRA") Visa Debit Cards and the PayFlex Card." *Id.* ¶ 50.

On June 16, 2015, "AlexSam [allegedly] sent Aetna a letter . . ., informing them that 'at least the following products require a license under the '608 Patent: Aetna Health Care FSA Debit Card and Aetna HAS Visa Debit Card.'" *Id.* ¶ 52 (citing Pl.'s Ex. E, ECF No. 57-5 (Dec. 6, 2019) ("2015 Notice Letter to Aetna")).

As of 2011, AlexSam alleges that PayFlex Holdings, Inc. ("PayFlex"), "an account-based health plan administrator with its HealthHub technology platform, became a wholly owned subsidiary of Aetna." *Id.* ¶ 53.

On July 10, 2015, AlexSam allegedly sent a letter to PayFlex "informing them that 'at least the following products require a license under the '608 Patent: HSA Visa Debit Card.'" *Id.* ¶ 54 (citing Pl.'s Ex. F, ECF No. 57-6 (Dec. 6, 2019) ("2015 Notice Letter to PayFlex")). Aetna allegedly "offers the PayFlex Card through its subsidiary, PayFlex[.]" *Id.* ¶ 55.

On or about February 2012, Aetna and Mastercard allegedly "announced their agreement for MasterCard to be 'the preferred payment brand for Aetna's card services' for FSA, HSA, HRA and other prepaid stored value cards." *Id.* ¶ 57 (citation omitted).

On July 15, 2012, Aetna's in-house counsel allegedly responded to both notice letters stating, "We anticipate that it will take several weeks to complete our review and will provide you with our response as soon as it is complete." *Id.* ¶ 58 (quoting Pl.'s Ex. H, ECF No. 57-8 (Dec. 6, 2019) ("Aetna's July 2015 Reply")). AlexSam alleges that "no further response was ever received, and Aetna continued to offer its infringing products." *Id.* ¶ 59.

AlexSam alleges that "Aetna now seeks to be covered by the License Agreement between AlexSam and MasterCard[,]" *id.* ¶ 63, but that "[a]t no time prior to this case has Aetna ever claimed to be licensed for the '608 Patent under the MasterCard Agreement or any other agreement," *id.* ¶ 64.

### 3. The License Agreement Between AlexSam and MasterCard

On or about June 20005, "AlexSam and MasterCard [allegedly] entered into a License Agreement which included . . . a license to AlexSam's Patents and included MasterCard's obligation to pay royalties for certain Licenseed Transactions that utilize the MasterCard network and/or brand . . . ." *Id.* ¶ 67. Under this agreement, "MasterCard [allegedly] agreed to pay royalties for Licensed Transactions." *Id.* ¶ 68. "MasterCard [allegedly] failed to pay royalties to AlexSam for many years and has never paid any royalties to AlexSam for transactions initiated by any of Aetna's Accused Products." *Id.* ¶ 69. Nor has MasterCard ever paid "any royalties to AlexSam related in any way to Aetna and/or its products." *Id.* ¶ 70.

Under the Agreement, MasterCard allegedly is required "to pay royalties for Licensed Transactions for the 'entire value chain,' which is described in the Licensing Agreement as covering MasterCard's commercial partners." *Id.* ¶ 71. It also allegedly "requires MasterCard to pay royalties based on certain transactions, not the cards or accounts, that use the MasterCard network or brand." *Id.* ¶ 72. Lastly, the Agreement allegedly "does not cover end-users, such as

Aetna's customers/cardholders, and for this reason, AlexSam has entered into numerous license agreements with parties who offer for sale or sell a card product using a system involving the MasterCard network and they were not deemed sublicensed under the MasterCard Agreement." *Id.* ¶ 73.

Third parties, like Aetna, allegedly "have attempted to jump under the cover[age] of the MasterCard Agreement." *Id.* ¶ 79. AlexSam alleges that while "MasterCard [has] never [ ] acknowledged any sublicenses under the MasterCard Agreement, several third parties have claimed to be sublicensed." *Id.* ¶ 80.

### 4.  MasterCard License Litigation

On May 14, 2015, AlexSam "filed a [c]omplaint against MasterCard asserting a claim of breach of contract." *Id.* ¶ 76. That litigation is still pending in the Eastern District of New York. *Id.* ¶ 77. There, MasterCard has allegedly "claimed that the MasterCard Agreement is narrow and has never acknowledged that third-party activities are covered, which would include Aetna's Accused Products in this case[,] . . . [and] MasterCard has argued that the License Agreement has terminated early." *Id.* ¶ 78 (citing Pl.'s Exs. J & K, ECF Nos. 57-10–57-11 (Dec. 6, 2019)). AlexSam alleges that MasterCard has breached the Agreement "in many ways" and "[f]or years," by "its failure to pay royalties, comply with an audit request and other acts of breach." *Id.* ¶ 74. MasterCard allegedly "failed to remedy its breach of the MasterCard Agreement, refused to pay all outstanding royalties owed, and continued to intentionally breach the MasterCard Agreement." *Id.* ¶ 75.

Because of the limited interpretation of the scope of the Agreement MasterCard takes in that litigation, AlexSam allegedly "has been forced to litigate the interpretation of the MasterCard Agreement with several parties outside of the MasterCard Litigation and without

MasterCard's participation." *Id.* ¶ 81. "AlexSam and MasterCard disagree on the scope of the MasterCard Agreement and its interpretation." *Id.* ¶ 82.

AlexSam allegedly "has [ ] been forced to defend itself against claims by certain licensee[]s, . . . claiming unjust enrichment related to royalty payments made to AlexSam when it asserted that it was sublicensed under the MasterCard Agreement." *Id.* ¶ 84. These licensees include Green Dot Corporation and WEX Health. *Id.*[3]

### 5. Sublicensee Litigation

In 2007, AlexSam sued IDT Corporation ("IDT") for infringement of its '608 Patents. *Id.* ¶ 99. Ultimately, this litigation allegedly "resulted in a finding of validity of the claims asserted in that case, a finding of non-infringement related to certain accused products, and a finding that other accused products using the MasterCard network were sublicensed under the MasterCard Agreement, despite MasterCard never having paid any royalties for these IDT transactions." *Id.* ¶ 100.

This litigation allegedly "resulted in a portion of the damages awarded to AlexSam being subtracted to account for the Court's finding that certain transactions associated with IDT's SafeNet system should be covered by MasterCard." *Id.* ¶ 101. Despite this finding, "MasterCard [allegedly] has never paid AlexSam any royalties for any IDT Licensed Transactions." *Id.* ¶ 102.[4] AlexSam alleges Aetna's offering of VISA products or its license defense is not dispositive of the infringement of Claims 32 or 33 of the '608 Patent. *Id.* ¶ 104. Here, Claims 32

---

[3] AlexSam also notes previous litigation against IDT Corporation in 2007. SAC ¶ 85. "[T]he Federal Circuit determined that certain transactions using the MasterCard network were covered by the MasterCard Agreement." *Id.* MasterCard allegedly "has refused to acknowledge or accept that such IDT transactions are Licensed Transactions under the MasterCard Agreement and has therefore never paid royalties for nay IDT transactions." *Id.*

[4] The Federal Circuit affirmed the Eastern District of Texas's ruling allegedly "finding that, under the plain terms of the MasterCard Agreement, any activation transaction covered by the AlexSam Patents and taking place over the MasterCard network  was automatically deemed sublicensed, regardless of whether MasterCard made royalty payments for the transactions." *Id.* at ¶ 103.

and 33 of the '608 Patent allegedly "as asserted . . . are directed to medical cards and do not require an activation transaction as other claims in the '608 Patent, such as Claims 57 and 58 that were asserted against IDT." *Id.* ¶ 105.

In 2015, AlexSam sued Green Dot Corporation ("Green Dot"), "alleging breach of the parties' license agreement." *Id.* ¶ 94. Green Dot alleged "that it was covered by the MasterCard License." *Id.* ¶ 95. MasterCard was not brought in as a party nor did the court resolve "whether Green Dot was, in fact, sublicensed." *Id.* ¶ 96. AlexSam alleges that it "was forced to litigate the scope of the MasterCard Agreement and defend against a party's sublicense claim without the benefit of having MasterCard participate in the process and/or having taken a position as to cover of Green Dot's products and services." *Id.* ¶ 97. This case settled, and allegedly "MasterCard was specifically carved out of any relief as a result of the parties' resolution." *Id.* ¶ 98.

In 2017, WEX Health sued AlexSam. *Id.* ¶ 86. WEX Health was represented by Aetna's counsel in this action. *Id.* ¶ 87. While WEX Health allegedly claimed to be a sublicensee under the MasterCard License, "MasterCard was never brought in as a third party." *Id.* ¶ 88-89. Allegedly, "[a]t no time during the WEX Litigation did AlexSam ever concede and/or agree that any of WEX Health's accused products were covered by the MasterCard License and AlexSam never agreed that WEX Health was sublicensed under the MasterCard License or any other license." *Id.* ¶ 93. This case settled. *Id.* ¶ 92.

### 6. Aetna's Alleged Infringement

AlexSam alleges that Aetna infringes on Claims 32 and 33 of the '608 Patent "because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises the Accused Products that operate on the VISA Network" "by providing a multifunction card system, containing at least one debit/medical services card." *Id.* ¶¶ 107–08. Furthermore, the alleged

10

VISA products "have a Bank Identification Number ('BIN') approved by the American Banking Association" and allow Aetna "to properly route payment transactions within a banking network." *Id.* ¶ 108.

Aetna's "VISA Accused Products are [allegedly] available to individuals participating in healthcare benefits program[s] located in [Connecticut] and through the United States." *Id.* AlexSam also alleges that Aetna "owns, operates, or leases all equipment in the infringing system, or alternatively exercises discretion and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers." *Id.* ¶ 109. The alleged use of the infringing networks, making and configuration of the systems, and sale of products generated through the systems infringes on either or both Claim 32 and 33. *Id.* ¶ 111.

Aetna allegedly "undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Asserted Claims[.]" *Id.* ¶ 112. Aetna further allegedly "has intentionally induced and continues to induce infringement of the Asserted Claims and has committed contributory infringement . . . , by providing the hardware and/or software necessary for its customers to make or use the infringing multifunction card system." *Id.* ¶ 115. By providing the Processing Hub which is capable of "authorizing, approving, and declining payments at healthcare providers and pharmacies for eligible services, goods, and prescriptions[,]" Aetna allegedly contributes to the infringement of Claims 32 or 33. *Id.* ¶ 118. Aetna allegedly continues to receive "revenue from the provision of, sale and use of the VISA Accused Products." *Id.* ¶ 116.

11

At least as of June 2015 and if not earlier, Aetna allegedly "knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of the Asserted Claims by its customers, providers, and/or retailers." *Id.* ¶ 122.

With respect to Claim 33, AlexSam alleges that Aetna's MasterCard Accused Product infringes on Claim 33 "by providing a multifunction card system, containing at least one debit/medical services card." *Id.* ¶ 128. Aetna allegedly "owns, operates, or leases all equipment in the infringing system, or alternatively exercises discretion and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers." *Id.* ¶ 129.

In AlexSam's view, it is highly likely Aetna knew by June 2015, if not earlier, "that its actions [allegedly] constituted and continue to constitute infringement of claims of the '608 Patent and that the '608 Patent is valid." *Id.* ¶ 132. Aetna's infringement allegedly continues "by providing the hardware and/or software necessary for its customers to make or use the infringing multifunction card system." *Id.* ¶ 135. Aetna allegedly "has specifically intended its customers to use the MasterCard Accused Products in its infringing systems in such a way that infringes Claim 33 by, at a minimum, providing and supporting the MasterCard Accused Products and instructing its customers on how to use them in an infringing manner[.]" *Id.* ¶ 136.

AlexSam alleges that Aetna "knew or should know that [using the Processing Hub computers for use in the infringing systems] contribute[s] to its customers' infringement of Claim 33[,]" *id.* ¶ 138, and that Aetna "knew that its actions . . . would induce, have induced, and will continue to induce infringement by its customers by continuing to sell, support, and instruct its customers on using the MasterCard Accused Products," *id.* ¶ 140. For example, "providing the POS devices and bank Processing Hub computers which are capable of initiating the

activation and loyalty point crediting processes" that then causes the retailers' infringement of Claim 33. *Id.* ¶ 141.

## B. Procedural History

On June 28, 2019, AlexSam filed a Complaint for patent infringement against Aetna Inc. Compl., ECF No. 1 (June 28, 2019).

On October 4, 2019, AlexSam filed an Amended Complaint. Am. Compl., ECF No. 27 (Oct. 4, 2019).

On November 18, 2019, Aetna moved to dismiss the Amended Complaint. First Mot. to Dismiss, ECF No. 47 (Nov. 18, 2019).

On December 6, 2019, AlexSam filed a Second Amended Complaint. Second Am. Compl., ECF No. 57 (Dec. 6, 2019) ("SAC").

On January 10, 2020, Aetna moved to dismiss the Second Amended Complaint. Second Mot. to Dismiss, ECF No. 65 (Jan. 10, 2020) ("Def.'s Mot."); *see also* Mem. in Supp. of Mot. to Dismiss, ECF No. 66 (Jan. 10, 2020) ("Def.'s Mem."); Exs. A–Q, ECF Nos. 66-1–66-17 (Jan. 10, 2020).

On February 3, 2020, AlexSam filed an emergency motion to stay proceedings pending a determination by the judicial panel on multidistrict litigation. Emergency Mot., ECF No. 67 (Feb. 3, 2020).

On February 4, 2020, the Court granted AlexSam's emergency motion for a stay in proceedings. Order, ECF No. 68 (Feb. 4, 2020).

On February 4, 2020, Aetna filed a response to AlexSam's emergency motion and filed an emergency motion to vacate the order's previous grant of a stay. Resp., ECF No. 70 (Feb. 4,

2020); Emergency Mot. to Vacate, ECF No. 69 (Feb. 4, 2020). AlexSam filed a memorandum in opposition to Aetna's motion to vacate. Pl.'s Opp'n Mem., ECF No. 71 (Feb. 4, 2020).

On April 9, 2020, the Court partially lifted the stay to allow counsel to complete the briefing schedule for the pending motion to dismiss. Order, ECF No. 74 (Apr. 9, 2020).

On April 30, 2020, AlexSam filed a response to the motion to dismiss. Mem. in Opp'n, ECF No. 77 (Apr. 30, 2020) ("Pl.'s Opp'n").

On May 14, 2020, Aetna filed a reply. Def. Reply, ECF No. 80 (May 14, 2020).

On August 17, 2020, Aetna filed a notice of supplemental authority in support of its motion to dismiss the Second Amended Complaint. Notice, ECF No. 91 (Aug. 17, 2020).

On August 25, 2020, the Court held a telephonic motion hearing. Minute Entry, ECF No. 94 (August 25, 2020).

## II.     STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted) (alteration in original)).

Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.   DISCUSSION

The Court first will consider the claims against Aetna related to the MasterCard Networks, and then move to the claims against Aetna related to the Visa Networks. Finally, the Court will consider AlexSam's request for declaratory judgment.

### A.  The Alleged Patent Infringement on the MasterCard Networks

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) (citing 35 U.S.C. § 154 (1988)). The right to exclude may be waived, in part or totally, "by granting a license, which may be express or implied." *Id.* (citation omitted). Either an express or implied license is a defense to patent infringement. *Id.*

#### 1.  Express License

Aetna first argues that "Alex[S]am cannot state an actionable claim for patent infringement with respect to the PayFlex MasterCard card because the [AlexSam-MasterCard Patent License Agreement ("AMPL")] expressly covers any alleged infringement of Claim 33 of the '608 Patent involving the MasterCard network." Def.'s Mem. at 15. This is because "Aetna['s] [ ] alleged commercial relationship with Mastercard and its alleged use of the MasterCard network" fell under the MasterCard sublicense agreement "to the extent [Aetna] practiced Claim 33 of the '608 patent with respect to the PayFlex MasterCard card." *Id.* at 16.

Aetna cites to prior Federal Circuit decisions that "affirmed that the AMPL sublicenses each participant in the 'entire value chain' of a Licensed Transaction[,]" *id.* (citing *AlexSam, Inc.*, 715 F.3d at 1346) and a pending case in the Eastern District of New York, Mem. & Order, 1:15-cv-02799-ILG-SMG, ECF No. 226, at 2–3 (Sept. 226, 2019). Under either the Eastern District of New York's or the Federal Circuit's interpretation, "Aetna Inc. would have been part of the 'entire value chain,' and thus a sublicensee under the express AMPL," making it "not plausible that Aetna Inc. could have infringed Claim 33 with the PayFlex MasterCard and not have been licensed under the AMPL." Def.'s Mem. at 17 (emphasis omitted).

AlexSam responds that "Aetna's argument that its MasterCard Accused Products are covered completely by the MasterCard Agreement is" incorrect and premature. Pl.'s Opp'n at 11. There are unanswered threshold questions that must be answered: (1) when did the MasterCard Agreement terminate?; (2) is Aetna a sublicensee under the MasterCard Agreement?; and (3) If Aetna is a sublicensee, then what is the scope of its coverage? AlexSam argues that the date of termination of the agreement is relevant because Aetna may "be liable for infringement for its MasterCard Accused Products from at least the date of termination until the patents expired," a point supported by litigation over MasterCard's alleged failure to make royalty payments. *Id.* at 11–12. Without establishing if Aetna was an express sublicensee, AlexSam argues that it cannot be determined whether Aetna was covered under the agreement or infringed the agreement. *Id.* at 12–13. Finally, "there are numerous factual issues surrounding the scope of coverage, if any, provided to Aetna by the MasterCard Agreement." *Id.* at 14.

AlexSam argues further that, contrary to Aetna's argument, Aetna can infringe if not sublicensed "because it does not meet another requirement to be a Licensed Transaction." *Id.* at 15. In its view, whatever the coverage of the MasterCard Agreement, "Claim 33 of the '608 Patent is not included because, infringement of Claim 33 excludes the use of the MasterCard network and/or brand, which is a requirement to be a Licensed Transaction under the MasterCard agreement." *Id.* at 21–22. Specifically, AlexSam argues that there "is simply no use of the MasterCard network and/or brand to conduct this eligibility check in Claim 33 using the number assigned by Aetna, not MasterCard," meaning "Aetna's MasterCard Accused Products do not meet the requirements to be a Licensed Transaction under the MasterCard Agreement." *Id.* at 17.

Finally, AlexSam argues that whether the MasterCard Agreement is unambiguous is still at issue. *Id.* They contend that resolving this ambiguity on a motion to dismiss is improper. *Id.* at 18.[5]

Aetna replies that a previous court has "held that the AMPL is unambiguous and cover[s] the entire value chain." Def. Reply at 2. Aetna argues that the Second Amended Complaint is judged on the adequacy of its factual allegation, not these hypothetical questions raised by AlexSam. Aetna continues that the notice letters only refer to Visa and, in its view, "is a tacit admission that MasterCard cards were licensed (express or implied), and that Aetna Inc. is a third-party beneficiary." *Id.* at 3.

With respect to Claim 33, Aetna argues that either "(1) the MasterCard Accused Products do not practice Claim 33, or (2) the MasterCard Accused Products use the MasterCard network, and Aetna Inc. is therefore licensed as part of the entire value chain." *Id.* at 3. "Aetna Inc. cannot practice Claim 33 without necessarily practicing all the elements of Claim 32 because Claim 33 depends from Claim 32[,]" meaning "if Aetna Inc. is using the MasterCard network to practice Claim 32, it must still be using the MasterCard network when it practices the additional element of Claim 33." *Id.* at 4. Aetna also notes that AlexSam previously admitted "that Claim 33 is asserted against MasterCard in its license dispute." *Id.* Finally, Aetna concludes that "AlexSam's current position is contradicted by AlexSam's successful argument before the Patent Trial and Appeal Board that it is not possible for a MasterCard product to infringe Claim 33 outside the protection of the AMPL." *Id.*

The Court agrees.

---

[5] AlexSam also notes that "[r]egardless of whether Aetna is a sublicensee for any Licensed Transactions, which AlexSam contends it is not, AlexSam has no affirmative obligation to plead facts negating Aetna's expected (not yet pled) affirmative defense based on the MasterCard Agreement." Pl.'s Opp'n at 17.

The Agreement between AlexSam and MasterCard defines "Licensed Transaction" as follows:

> 1.3 <u>Licensed Transaction.</u> The phrase "Licensed Transaction" means each process of activating or adding value to an account or subaccount which is associated with a transaction that utilizes MasterCard's network or brands wherein data is transmitted between POI Device and MasterCard's financial network or reversing such process, provided that such process is covered by one of the Licensed Patents. Such Licensed Transaction includes the entire value chain and all parts of the transaction and may involve other parties including but not limited to: issuing banks, acquiring banks, processors, merchants, card vendors and third party marketing firms. To the extent that these other parties participate in a Licensed Transaction, they will also be licensed under this Agreement, but only to the extent of such parties' participation in a Licensed Transaction.

Pl.'s Ex. I, ECF No. 57-9 at P.02 (Dec. 6, 2019) ("AMPL" or "MasterCard Agreement"). MasterCard retained the right to grant sub-licenses. *Id.* at P.03; *see id.* ("Unless otherwise sublicensed as permitted hereunder, all Licensed Transactions shall be deemed sublicensed under an implied sublicense granted hereunder to all participating parties.").

Upholding a district court ruling, the Federal Circuit determined "that under the plain terms of [the] agreement, any activation transaction covered . . . and taking place over the MasterCard network was automatically 'deemed sublicensed,' without regard to the intent of either Alexsam or MasterCard regarding that particular transaction." *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1346 (Fed. Cir. 2013). That same reasoning should apply here.

Although the case in *IDT Corp.* involved activation transactions, those transactions are similar to these Claims. *See id.* at 1339 (quoting Claim 57 from the '608 Patent; "A multifunction card system comprising: a. at least one card having a unique identification number encoded on it, . . . b. a transaction processor *receiving card activation data from an unmodified existing standard retail point-of-sale device*, . . . c. a processing hub receiving directly or

indirectly said activation data from said transaction processor; and d. said processing hub activating an account . . . ." (emphasis in original)). Indeed, Claim 32 contains some of the exact language as Claim 57.

As a result, any transaction covered by Claim 32 or 33 "taking place over the MasterCard network [would be] automatically 'deemed sublicensed,' without regard to the intent of either Alex[S]am or Mastercard regarding that particular transaction." *Id.* at 1346. Because the phrase "value chain" incorporates these transactions, they fall within the scope of a sublicense.

AlexSam argues that "MasterCard [has] never acknowledge[d] any sublicenses under the MasterCard Agreement," SAC ¶ 80; and that "[a]t no time prior to this case has Aetna ever claimed to be licensed for the '608 Patent under the MasterCard Agreement or any other agreement," *id.* ¶ 64. But any previous claim is not relevant to the licensing inquiry or whether the transactions fall under the AMPL.

Under the plain language of the AMPL, the relevant transactions on multifunction cards provided by Aetna fall within the scope of a sublicensing agreement with MasterCard, and nothing in AlexSam's Second Amended Complaint requires a different result. To the extent a "real possibility" exists "that Aetna *does* infringe, . . . but Aetna is not sublicensed for this conduct because it does not meet another requirement to be a Licensed Transaction[,]" Pl.'s Opp'n at 15, AlexSam's "real possibility" argument fails. As discussed further below, the U.S. Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) govern. As a result, AlexSam must plead "more than a sheer possibility that [Aetna] has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Indeed, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

(citations and internal quotation marks omitted). Having raised nothing more than the "real possibility" of infringement, AlexSam's Second Amended Complaint does "not permit the court to infer more than the mere possibility of misconduct, [thus] the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Id.* at 679 (citations and internal quotation marks omitted) (second alteration in original).

Accordingly, the motion to dismiss will be granted on the express license issue.

### 2. Implied License

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997); *see also Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1360 (Fed. Cir. 2008) ("The implied license defense is typically presented 'when a patentee or its licensee sells an article and the question is whether the sale carries with it a license to engage in conduct that would infirnge the patent owner's rights. '" (quoting *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1100 (Fed. Cir. 2004)). "[I]mplied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang Labs., Inc.*, 103 F.3d at 1580 (citation omitted).

To establish an implied license (1) "the product sold by the patentee or its licensee 'must have no noninfringing uses'" and (2) "the circumstances of sale must 'plainly indicate that the grant of an implied license should be inferred." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 99 F.3d 1160 (Table), at *2 (Fed. Cir. 1996) (quoting *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1984)).

"The 'noninfringing use' doctrine applies when a patentee or its licensee sells an article and the question is whether the sale carries with it a license to engage in conduct that would

infringe the patent owner's rights." *Jacobs*, 370 F.3d at 1100. In this context, "absent an express agreement between the parties, determining whether the sale conveys with it the implied right to use the article in an infringing manner may depend on whether there is any noninfringing use for the article." *Id.*

Aetna argues that, even if no express license was present, "Aetna Inc. would benefit from an implied license" in so far as "it practices Claim 33 with respect to PayFlex MasterCard cards." Def. Mem. at 18. In Aetna's view, "the AMPL 'goes much further' and is intended to grant protection to MasterCard's customers." *Id.* at 19 (citing *Jacobs*, 370 F.3d at 1101–02).[6]

In discussing direct infringement, AlexSam argues that "while Aetna may very well be a commercial partner in the 'entire value chain' its infringing conduct under Claim 33 does not satisfy the definition of a Licensed Transaction, . . . and therefore no sublicense, implied or expressed, would apply." Pl.'s Opp'n at 15.

The Court disagrees.

Because the Court already has determined that an express license existed for the PayFlex Accused Products, and that is the only Accused Product covered by an implied license, the Court need not reach the issue of whether there is an implied license.

---

[6] Aetna also argues that "Alexsam's actions demonstrated its understanding that the PayFlex MasterCard card was a licensed product to the extent it practiced any claims of the '608 patent" and that it was not until October, 4 2019, after amending its Complaint in this case, that the MasterCard multifunction card systems were infringing upon Claims 32 and 33. *Id.* at 20. The AMPL "contains a broad license and sublicense grant that, . . . cover 'all transactions for basically all cards other than credits[,]" meaning that "either the PayFlex MasterCard card did not practice Claim 33, and therefore there was no infringement; or this card practiced Claim 33, and therefore it was a licensed product and there was no infringement." *Id.* at 21.

### B. Patent Infringement on The Visa Network

Before addressing the alleged patent infringement claims with respect to Aetna on the Visa Network, two underlying principles are worth noting.

First, the Court considers the '608 Patent to be a system patent, based on the language of the patent itself. '608 Patent; *see id.* at A-4 ("The present invention relates generally to debit card systems, both bank-issued and non bank-issued, and more particularly to a multifunction card system that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet."); *see also Centillion Data Sys., LLC v. Qwest Commc'ns In'tl, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (a claimed system "is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained" (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316–17 (Fed. Cir. 2005), *abrogated on other grounds by* IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359 (Fed. Cir. 2014))).

Second, before December 1, 2015, Form 18 under Rule 84 of the Federal Rules of Civil Procedure governed pleading in patent infringement cases. After this date, amendments to the Federal Rules of Civil Procedure changed the pleading standard, and the applicable law makes clear that patent infringement claims, just like any other claim brought in federal court, are governed by the standard set forth in the Supreme Court's decisions in *Iqbal* and *Twombly. See Lyda v. CBS Corp.*, 838 F.3d 1331, 1337 n.2 (Fed. Cir. 2016) ("The Appendix of Forms, including Form 18, and Federal Rule of Civil Procedure 84, which provides that the forms 'suffice under these rules,' were both eliminated from the Federal Rules of Civil Procedure following changes that took effect on December 1, 2015."); *see id.* (even though the amended

complaint was filed in 2014, Form 18 did not apply to claim for joint patent infringement and so *Iqbal/Twombly* was the appropriate pleading standard to apply).

### 1. Direct Infringement

35 U.S.C. § 271(a) provides "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent." "Under this form of liability, a defendant's mental state is irrelevant. Direct infringement is a strict-liability offense." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015); *see also Applera Corp. v. MJ Research Inc.*, 305 F. Supp. 2d 170, 172 (D. Conn. 2004) ("Determining patent infringement requires determining whether someone (1) without authority (2) makes, uses, offers to sell, sells, or imports (3) the patented invention (4) within the United States, its territories, or its possession (5) during the term of the patent." (citations omitted)).

"Direct infringement can be found when a defendant makes a product containing 'each and every limitation set forth in claim.'" *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1371 (Fed. Cir. 2019) (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005)). The patentee bears the burden of "prov[ing] infringement by a preponderance of the evidence." *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545 (Fed. Cir. 1987).

### i. Single-Party Direct Infringement

"[F]or a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to infringe the patent, either personally or vicariously." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013). The "single actor" rule finds "[d]irect infringement under § 271(a) occurs where all steps of a

claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) ("*Akamai V*").

Aetna argues that AlexSam appears to bring a claim for joint infringement, Def.'s Mem. at 25, but that it fails to state a claim for either single-party direct infringement or divided direct infringement. *Id.* at 26, 28. With respect to single-party direct infringement, Aetna contends that the "boilerplate allegations" here are the same as in AlexSam's two prior Complaints, the "Second Amended Complaint contains conclusory allegations about 'loyalty point crediting processes' as factual infringement of Claims 32 or 33," and that AlexSam fails to "allege facts showing that Aetna  Inc., standing alone, made, used, sold, or offered for sale the 'multifunction card system' of Claims 32 and 33." *Id.* at 26–27.[7]

Furthermore, in its view, the "Accused Visa Products are debit cards that access certain types of financial accounts," like HSAs, FSAs, and HRAs, but these "financial accounts are distinct from the health insurance plans offered by an Aetna entity identified in the exhibits to the [Second Amended Complaint]." *Id.* at 28. They conclude that the Second Amended Complaint does not provide "a plausible basis to believe that Aetna Inc. made, used, sold or offered for sale a 'multifunction card system' that met all of the limitations of Claim 32 or Claim 33 or the '608 patent." *Id.*

AlexSam responds[8] that Aetna's arguments "are premised on the wrong line of cases[,]" as those cases rely on method claims and system claims. Pl.'s Opp'n at 25–26. AlexSam

---

[7] Aetna also notes that the Accused Visa Products attached to the Second Amended Complaint are immaterial to the lawsuit as the "'608 Patent does not claim a health insurance plan" and "a health insurance plan [is not] an element of the 'multifunction card system' claimed in the asserted claims of the '608 Patent." Def.'s Mem. at 27.

[8] AlexSam does not separate its argument by single-party direct infringement or divided direct infringement, but argues that it "has plausibly alleged [both] direct single actor and vicarious liability for Aetna." Pl.'s Opp'n at 29. The Court will summarize AlexSam's argument in Section B.2.i only, and then proceed to analyze both theories of infringement in the applicable section.

continues that the "Second Amended Complaint identifies the exact VISA Accused Products, including relevant pictorial representations of the products from Aetna's website and marketing materials, that are accused of infringing AlexSam's patent, and AlexSam explains exactly how the VISA Accused Products are used to meet the core limitations of these two claims (Claim 32 and 33) of the '608 Patent." *Id.* at 27 (citing SAC ¶¶ 6–8). AlexSam contends that their allegations "are sufficient to put Aetna on notice of [the infringement claims] . . . . and the grounds upon which the claims rest." *Id.* at 27–28.

In its view, the Second Amended Complaint also "clearly defines the Visa Accused Products" and "articulates each element of Claim 32 and 33 as they apply to each of the Accused Products." *Id.* at 28. AlexSam alleges "that Aetna directly infringes because it makes or uses the VISA Accused Products[,]" and to the extent Aetna employees use the offered HSA, HRA, and FSA products "it is plausible that Aetna employees use the debit/medical services cards offered by Aetna, which constitutes infringement." *Id.* AlexSam believes it has "plausibly demonstrate[d] that Aetna directs and controls how and where the customers can use the card, subject to its terms and conditions and federal regulations" and that "Aetna directs and controls various financial institutions . . . *via* its control of MasterCard." *Id.* at 29 (emphasis in original).

Aetna replies that "Alex[S]am has not given adequate notice of its infringement theories." Def.'s Reply at 5. Aetna argues that the Federal Circuit's decision in *Disc Disease Sols., Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018) has not changed *Twombly*'s pleading standards and that unlike the technology at issue in that case—a back-brace— AlexSam's use of a picture does not capture the "multifunction card system—claimed to include an unmodified point of sale device, a banking network, a processing hub, and the ability to access multiple databases . . . ." *Id.*

Aetna further argues that "Alex[S]am has identified the four Visa products that it contends are part of an allegedly infringing system, but it has failed to plead facts plausibly demonstrating that *Aetna Inc.* is responsible." *Id.* at 6 (emphasis in original). In its view, "Alex[S]am offers only conclusory assertions that Aetna Inc. *presently* makes or uses the accused products to allege *past* infringement." *Id.* at 6 (emphases in original).

The Court agrees.

AlexSam has alleged that this Court has jurisdiction, SAC ¶¶ 7–9, that AlexSam owns the rights to the '608 Patent, *id.* ¶ 3, and has demanded damages, *id.* ¶ 154. AlexSam, however, has not plausibly alleged that Aetna has infringed by making, selling, or using the '608 Patent. *See id.* ¶ 50 (naming the Visa Debit FSA, HSA, and HRA Cards as infringing products); ¶¶ 108–09 ("Defendant's VISA Accused Products infringe the Asserted Claims by providing a multifunction card system, containing at least one debit/medical services card. . . . Defendant owns, operates, or leases all equipment in the infringing system, or alternatively exercises direction and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers."); ¶ 128 ("MasterCard Accused Products infringe Claim 33 by providing a multifunction card system, containing at least one debit/medical services card."); ¶ 130 ("Defendant employs staff . . . to operate the Processing Hub in order to interface with, install, configure, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system.").[9]

---

[9] The Court notes that the cases AlexSam relies on for pleading standards are unhelpful in this case. They either deal with the production, or "make," prong of Section 271(a), *Lifetime Indus. Inc. v. Trim-Lock Inc.*, 869 F.3d 1372 (Fed. Cir. 2017); method claims, *Nalco Co v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), or simple technologies, *Disc Disease Sols. Inc.*, 888 F.3d 1256—none of which are relevant to this case.

AlexSam's claim thus rests largely on Aetna selling allegedly infringing products and administering information technology support to third-party users, their customers, and then generating revenue for Aetna. SAC ¶¶ 1, 32, 50, 73, 107, 111, 113, 116, 118, 127, 131, 133, 135–36, 138. Aetna may provide the physical cards and technical support, but the ultimate user, the user allegedly causing the infringement, is a third-party customer.

In a systems claim, infringement is assumed "by the sale of a system." *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345 (Fed. Cir. 2019). The question then becomes, "whether 'all of the elements of the claim . . . [are] present in the accused system[s]' allegedly sold." *Id.* (alterations in original). AlexSam has alleged the sale of its system, but its Second Amended Complaint is vague or conclusory and does not link Aetna's actions to allegedly infringing conduct.

AlexSam's allegations do not state "more than a sheer possibility that [Aetna] has acted unlawfully." *Iqbal*, 556 U.S. at 678. AlexSam does not articulate exactly how Aetna's use is infringing, beyond its provisions of hardware and use of the Processing Hub. AlexSam appears to conflate the health insurance plans offered by Aetna with the alleged "multifunction card system." While AlexSam argues that its Second Amended Complaint "includes preliminary infringement contention-level detail," the Second Amended Complaint lacks this specificity.

Indeed, the Second Amended Complaint lacks precise and clear detail as to any allegedly infringing conduct and instead relies on broad, speculative generalizations. *See, e.g.,* SAC ¶ 108 ("Defendant's VISA Accused Products infringe the Asserted Claims by providing a multifunction card system, containing at least one debit/medical services card."); ¶ 111 ("By using the infringing networks, making and configuring the systems, and selling products generated through the use of the systems, Defendant has directly infringed one or both of the

Asserted Claims."); ¶ 121 ("Acts by Defendant that contribute to the infringement of these retailers include providing the POS devices and bank Processing Hub computers which are capable of initiating the activation and loyalty point crediting processes."); ¶ 130 ("Defendant employs staff . . . to operate the Processing Hub in order to interface with, install, configured, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system."). It is also unclear how these cards would operate without the assistance of Visa (or MasterCard, if not covered by the licensing agreement)—neither of which is a defendant in this case—or the other subsidiary companies that also provide or offer these products. AlexSam thus has only pled facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Accordingly, Aetna's motion to dismiss on the grounds of single-party direct infringement will be granted.[10]

### ii. Divided Direct Infringement

"Where more than one actor is involved in practicing the [infringing] steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai V*, 797 F.3d at 1022. A single entity may be responsible "(1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Id*. "*Akamai* 'broaden[ed] the circumstances in which others' acts may be attributed to an accused infringer to support direct-infringement liability for divided infringement, relaxing the together constraints on such attribution reflected in [the Federal

---

[10] Because the Court finds that AlexSam has not alleged single-party direct infringement, the Court will not consider whether AlexSam's 2015 letters provided sufficient notice of infringement.

Circuit's] earlier precedents." *Nalco Co. v. Chem-Mod, LLC.*, 883 F.3d 1337, 1351 (Fed. Cir. 2018) (quoting *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1381 (Fed. Cir. 2017)).[11]

"[A]llegations of joint infringement require elements beyond those for the more typical act of direct infringement to which Form 18 is directed[,]" and so are governed by the pleading standard of *Iqbal* and *Twombly,* rather than Form 18. *Lyda*, 838 F.3d at 1339.[12]

Aetna argues that AlexSam also fails to state a claim for divided direct infringement. Def.'s Mem. at 28. In its view, AlexSam's Complaint lacks any "plausible allegations that can give rise to a theory of vicarious liability for direct infringement by 'acts through an agent (applying traditional agency principles) or contracts with' a third party 'to perform one or more steps' of a patent." *Id.* (quoting *Akamai*, 797 F.3d at 1023). Specifically, AlexSam fails to "identify which steps a third party performed or name the third parties that were allegedly involved." *Id.* at 28–29. "Nor has AlexSam alleged that Aetna Inc. somehow 'conditions

---

[11] AlexSam suggests that *Centillion* and *Lyda* demand a different outcome than *Akamai*. While the two lines of cases distinguish method and system claims, the Court finds *Centillion* to be narrower than AlexSam would suggest—mainly, that infringing "use" of a system claim under Section 271(a) includes a "customer [who] puts the system as a whole into service, *i.e.*, controls the system and obtains benefit from it." *Centillion*, 631 F.3d at 1285; *see id.* (the customer can cause "the system as a whole to perform this processing and obtain[ ] the benefit of the result, [accordingly ] the customer has 'used' the system under § 271(a)."). After considering infringing use, the analysis then ends. Consequently, a customer's use does not implicate the defendant processor. *See id.* ("It makes no difference that the back-end processing is physically possessed by [defendant]. The customer is a single 'user' of the system and because there is a single user, there is no need for the vicarious liability analysis from *BMC* or *Cross Medical*."). Furthermore, the similarity between systems and method claims also suggests that the pleading standards of *Akamai* would be relevant to systems claims. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (noting "system claims [ ] closely track method claims and are grounded by the same meaningful limitations [and] will generally rise and fall together.... [S]ystem claim[s] essentially implement[ ] the process of the method claim on a general purpose computer."

[12] Despite AlexSam's arguments to the contrary, the Federal Circuit's decision in *Disc Disease* did not change the pleading standard. The court in *Disc Disease* reversed a dismissal where plaintiff sufficiently pleaded factual allegations "under the plausibility standard of *Iqbal/Twombly*" where the underlying technology was simple and the asserted patents "consist[ed] of only four independent claims." *Disc Disease*, 888 F.3d at 1260. The complaint also "specifically identified the three accused products—by name and by attaching photos of the product packaging as exhibits—and alleged that the accused products meet 'each and every element of at least one' of the claims. *Id.* The Federal Circuit has since stated that *Disc Disease* did not result in a lesser pleading standard, just that, in the facts of that case and the allegations made, the plausibility standard required by *Iqbal* and *Twombly* were met. *Artrip v. Ball Corp.*, 735 F. App'x 708, 714 (Fed. Cir. 2018) (summarizing the plausibility standard and noting that the court "applied these requirements in *Disc Disease*.").

participation in an activity or receipt of a benefit upon performance [of the patent] and establishes the manner or timing of that performance.'" *Id.* at 29 (quoting *Akamai Techs., Inc.*, 797 F.3d at 1023).

To the extent "AlexSam contends a third party directly infringed based on a divided infringement theory, . . . . it has neither identified nor alleged that any third party directed or controlled each of the entities, including Aetna Inc., that allegedly provided the different elements of these claims." *Id.* at 35. Similarly, Aetna argues that AlexSam has not "made a plausible factual allegation that Aetna Inc. knew that any alleged components are especially made or especially adapted for use in infringement." *Id.* (citing *In re Bill of Lading*, 681 F.3d at 1337).

In reply, Aetna argues that "[i]t is facially implausible that Aetna Inc. controls all banks and retailers, plus MasterCard and Visa," and accordingly, that the claim should be dismissed. Def.'s Reply at 7.

The Court agrees.

First, applying the definition of use established in *Centillion*, for Aetna to be liable, it would need to "put the claimed invention into service, *i.e.*, control the system and obtain benefit from it." *Centillion*, 631 F.3d at 1286. Or, put differently, "to prove an infringing 'use' of a system under § 271(a), a patentee must demonstrate 'use'—that is, 'control' and 'benefit'—of the claimed system by an accused direct infringer." *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1328 (Fed. Cir. 2017).

"[T]o use a claimed system, what must be 'used' is each element." *Id.* at 1329 (citing *Centillion*, 631 F.3d at 1284). AlexSam may only establish "use" by Aetna "if [Aetna] is vicariously liable for the actions of its customers such that 'use' by the customers may be

attributed to [Aetna]." *Centillion*, 631 F.3d at 1286. AlexSam cannot establish such use. "In a situation where a 'back-end system[]' is used for processing certain data or information, the party collecting the information may still be said to be using the system because, '[i]f the user did not make the request, then the back-end processing would not be put into service,' demonstrating 'control' of the system." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1239 (Fed. Cir. 2017) (alterations in original) (quoting *Centillion*, 631 F.3d at 1285).

Significantly, while AlexSam argues that Aetna improperly relies on method claim caselaw, AlexSam relies on method claim caselaw to demonstrate, in contrast, that it has "plausibly demonstrate[d] that Aetna directs and controls how and where the customers can use the card, subject to . . . federal regulations[,] . . . . [and] directs and controls various financial institutions, . . . *via* its control of MasterCard." Pl.'s Opp'n at 28–29 (comparing the Second Amended Complaint to *W. Express Bancshares, LLC v. Green Dot Corp.*, 2019 WL 4857330 (S.D.N.Y. Oct. 2, 2019)) (emphasis in original).[13]

Accordingly, because AlexSam does not allege how Aetna controls each element of its claim, Aetna's motion to dismiss as to divided infringement will be granted.

## 2.   Indirect Infringement

"Absent direct infringement, there can be neither contributory nor induced infringement." *Everpure, Inc. v. Cuno, Inc.*, 705 F. Supp. 725, 732 (D. Conn. 1988). "To state a claim for indirect infringement, therefore, a plaintiff need not identify a *specific* direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists." *In re Bill of Lading*, 681 F.3d at 1336 (emphasis in original).

---

[13] The decision in *W. Express* further suggests dismissal here is appropriate as AlexSam argues, only in vague and conclusory manner, that Aetna "directs or controls [ ] [another] entity whose involvement is essential for the claims' steps." 2019 WL 4857330, at *4.

Aetna begins by noting that either an induced infringement or contributory infringement by AlexSam must fail because "AlexSam does not plausibly allege *direct* infringement by a third party." Def.'s Mem. at 30 (emphasis in original). Specifically, "AlexSam does not plausibly allege that the holding company Aetna Inc. had customers, and AlexSam pleads no facts to show how customers who bought health insurance from Aetna Inc.'s subsidiaries might have, for example, used or sold a system that included an 'unmodified pre-existing standard point-of-sale device,' a 'transaction processor,' and a 'Processing Hub.'" *Id.* at 30–31. In its view, any letters sent by AlexSam "are inadequate to plausibly allege the requisite knowledge of infringement." *Id.* at 32.

AlexSam responds to Aetna's specific arguments regarding induced and contributory infringement, but the Court has already found AlexSam has failed to plead alleged direct infringement.

Accordingly, AlexSam's claims for indirect infringement cannot proceed and will be dismissed.

Even if AlexSam had adequately pleaded direct infringement, these claims still would be dismissed.

### i.  Induced Infringement

35 U.S.C. § 271(b) states: "Whoever actively induces infringement of a patent shall be liable as an infringer." This provision "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Specifically, "that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009) (citing *DSU Med. Corp. v. JMS Co.*,

471 F.3d 1293, 1304 (Fed. Cir. 2006)); *see also Commil*, 135 S. Ct. at 1926 ("[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" (citation omitted)). "Intent can be shown by circumstantial evidence, but the mere knowledge of possible infringement will not suffice." *Vita-Mix Corp.*, 581 F.3d at 1328 (citing *DSU Med. Corp.*, 471 F.3d at 1305–06)). "[L]iability for induced infringement under § 271(b) 'must be predicated on direct infringement.'" *Eli Lilly and Co. v. Teva Parenteral Meds. Inc.*, 845 F.3d 1357, 1363–64 (Fed. Cir. 2017) (quoting *Limelight Networks, Inc. v. Akamai Techs., Inc.* 572 U.S. 9155, 920 (2014)).

Aetna argues that (1) "there are no plausible allegations that a third-party has infringed Claims 32 or 33"; (2) "there are no factual allegations to show that Aetna Inc. knew that the acts of any third party would have infringed Claims 32 and 33 of the '608 Patent"; and (3) "AlexSam fails to plausibly allege that Aetna Inc. induced the allegedly infringing actions of a third-party." Def.'s Mem. at 31, 33.

AlexSam argues that, under the burdens imposed by existing caselaw, it has adequately "pled direct infringement and factual allegations supporting specific elements for induced and contributory infringement." Pl.'s Opp'n at 26. Specifically, "AlexSam plausibly alleged direct infringement by Aetna's 'customers,' Aetna's knowledge of the '608 Patent based on the 2015 Letter, and specific intent to infringe the patent under *Twombly/Iqbal*, thereby meeting the pleading standard for indirect infringement." *Id.* at 29. It alleged direct infringement by Aetna's customers, alleged Aetna's knowledge of the '608 Patent and Assorted Claims through the June 2015 letter, and "adequately pled specific intent." *Id.* at 30–31.

Aetna replies that "a patentee cannot rely on vague letters to allege the requisite knowledge, as AlexSam does." Def.'s Reply at 7. Aetna argues that "ÁlexSam does not plausibly

allege that Aetna Inc. provides specific instruction or encouragement to practice the 'system' of Claims 32 or 33" nor do their factual allegations "identify any particular statement or material that plausibly suggests Defendant[] intend to induce infringement". *Id.* at 7–8 (quoting *DoDots Licensing Sols. LLC v. Lenovo Holding Co.*, C.A. No. 18-098, 2018 WL 66229709, at *4–5 (D. Del. Dec. 19, 2018)).

The Court agrees.

Again, AlexSam has done nothing more than plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see Protegrity Corp. v. Paymetric, Inc.*, No. 3:13-CV-01549 (VLB), 2014 WL 3849972, at *4 (D. Conn. Aug. 5, 2014) (granting motion to dismiss where the complaint failed "to allege any facts regarding the customers, clients, or suppliers who [defendant] allegedly induced to infringe [plaintiff's] patents, and [was] devoid of a single fact to raise the reasonable inference that the [d]efendant knowingly induced infringement and possessed specific intent to encourage another's infringement").

Accordingly, the motion to dismiss as to induced infringement would have to be granted.

### ii.  Contributory Infringement

Contributory infringement exists "to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others." *Dawson Chem. Co. v. Rohm and Haas Co.*, 448 U.S. 176, 188 (1980). It is of particular importance "where enforcement against direct infringers would be difficult, and where the technicalities of patent law make it relatively easy to profit from another's invention without risking a charge of direct infringement." *Id.* (citation omitted). "Contributory

infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *In re Bill of Lading*, 681 F.3d at 1337 (quoting 35 U.S.C. § 271(c)).

"To state a claim for contributory infringement, therefore, a plaintiff must, among other things, plead facts that allow an inference that the components sold or offered for sale have no substantial non-infringing uses." *Id.* (citation omitted). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327. "When the holder of a patent with system claims accuses a customer of direct infringement based on the customer's making, using, or selling of an allegedly infringing system in which a supplier's product functions as a material component, there may be an implicit assertion that the supplier has indirectly infringed the patent." *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1376 (Fed. Cir. 2011).

Aetna characterizes AlexSam's claim for contributory infringement as "limited to the allegation that Aetna Inc. provided a 'processing hub' component, 'hardware and/or software,' and 'POS devices' for use in an infringing system." Def.'s Mem. at 34 (quoting SAC ¶¶ 115, 118, 121). In its view, "the conclusory allegations that *one* of these components, the processing hub, 'has no substantial non-infringing use'" fails under *Iqbal* and *Tombly*. *Id.* (quoting SAC ¶¶ 115, 118, 121). Furthermore, the Second Amended Complaint lacks "a plausible, factual allegation of infringement by a third party" and "fails to allege that any third party made, used, or sold the entire 'multifunction card system.'" *Id.* at 35.

AlexSam argues that it (1) "has plausibly and adequately pled direct infringement[,]" (2) "has pled Aetna's pre-suit knowledge of combination[,]" (3) "adequately alleged that the Processing Hub has no substantial non-infringing uses and is a material part of the invention." Pl.'s Opp'n at 32. Because it "is plausible that the software and hardware components of the Processing Hub are unique to the infringing functionality," AlexSam believes its Complaint "adequately support[s] claims of contributory infringement." *Id.* at 33.

Aetna reiterates that "AlexSam cannot state a claim for contributory infringement without alleging direct infringement." Def.'s Reply at 8. "While AlexSam argues that unspecified and unalleged 'software and hardware components are unique to the infringing functionality,' the test is whether there are no substantial non-infringing uses, and it is implausible that 'any computer' has no substantial non-infringing uses." *Id.* (quoting Pl.'s Opp'n at 33).

The Court agrees.

Because the Court has determined that AlexSam has not plausibly alleged Aetna's direct infringement, with respect to the claim of contributory infringement, AlexSam's claim fails. Moreover, as to contributory infringement specifically, once again, AlexSam has simply plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

Accordingly, Aetna's motion to dismiss for contributory infringement would have to be granted.

## C.  Claims for Alleged Acts of Subsidiaries

A parent corporation may be liable for direct infringement under Section 271(a) by a subsidiary "if the evidence reveals circumstances justifying disregard of" the two entities "as

distinct, separate corporations." *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988). "[T]he plaintiff must show that the parent has a direct financial interest in the infringing activity, and that the parent has the right and ability to supervise the subsidiary, which is evidenced by some continuing connection between the two in regard to the infringing activity." *Broadvision Inc v. General Elec. Co.*, 2009 WL 1392059, at *4 (S.D.N.Y. May 5, 2009) (quoting *Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994).

Aetna argues that "[t]here are no plausible allegations that would allow Alex[S]am to sue Aetna Inc. for the alleged acts of its (unidentified) subsidiaries here." Def.'s Mem. at 35. Aetna points to both the PayFlex MasterCard and subsidiaries tied to the Visa Accused products. *Id.* at 35–36; *see id.* at 36 ("Nor has Alex[S]am alleged facts that would lead to liability for Aetna Inc. for the alleged acts of subsidiaries that may be involved with the Visa Accused Products."). Aetna contends that all "claims [that] pertain to the acts of unnamed subsidiaries [ ] should therefore be dismissed with prejudice." *Id.*

AlexSam argues that "Aetna has independent liability for the acts of infringement alleged in the complaint." Pl.'s Opp'n at 33. AlexSam contends "that Aetna has 'alter ego' liability for the conduct of its subsidiaries, including PayFlex." *Id.* at 34. As an example, AlexSam explains that when it first "notified PayFlex that it was using AlexSam's patented technology and that it required a license. . . . Aetna deliberately inserted itself into the dispute and took complete control of and responsibility for its resolution." *Id.* at 34–35. AlexSam also notes that Aetna offers third-party access "to an infringing system utilizing cards with the Aetna brand and logo," infringes through the same way through its employees, and that use of "Aetna's cards to access the Aetna system" by customers infringes on AlexSam's patent. *Id.* at 35.

The Court disagrees.

AlexSam alleges that PayFlex is a "wholly owned subsidiary of Aetna" and that Aetna responded to the June 2015 Letter sent to PayFlex. SAC ¶¶ 53-54, 58. AlexSam fails to allege control or direction by Aetna which would warrant disregarding the corporate form. To the extent there are relevant to unnamed subsidiaries, the same analysis applies.

Accordingly, the motion to dismiss will be granted on this basis.

### D.  Willful Infringement

35 U.S.C. § 284 allows a court to "increase the damages up to three times the amount found or assessed." "[S]uch enhanced damages are appropriate where a district court finds, in its discretion, the case before it to be an 'egregious case[ ] of misconduct beyond typical infringement.'" *Novartis Vaccines & Diagnostics, Inc. v. Regeneron Pharms., Inc.*, C.A. No. 18-cv-2434, 2018 WL 5282887, at *2 (S.D.N.Y. Oct. 24, 2018) (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016)). "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Halo Elecs.*, 136 S. Ct. at 1933.

"The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id.*; *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340 (Fed. Cir. 2016) ("[A]n infringer's subjective bad faith alone may support an award of enhanced damages." (citing *Halo Elecs.*, 136 S. Ct. at 1933)). Consequently, "the entire willfulness determination is to be decided by the jury." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1353 (Fed. Cir. 2018); *see also Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) ("Under *Halo*, the concept of 'willfullness' requires a jury to find no more than deliberate or intentional infringement. . . . The question of enhanced damages is addressed by the

court once an affirmative finding of willfulness has been made. It is at this second stage at which the considerations of egregious behavior and punishment are relevant." (citations omitted)).

Aetna argues that the Second Amended Complaint does not state a claim for willful infringement because (1) "Alex[S]am has not stated a plausible claim for either direct or indirect infringement against Aetna Inc., and thus a claim for willful infringement cannot stand" and (2) "Alex[S]am does not plead facts sufficient to show that Aetna Inc. had a subjective intent to infringe or committed an egregious act of infringement with respect to MasterCard or Visa cards." Def.'s Mem. at 36.

AlexSam argues that it has "plausibly and adequately pled direct and indirect infringement." Pl.'s Opp'n at 37. In its view, its previous letters to Aetna and Payflex identifying the '608 Patent and accused products "asserted that Aetna's products were using the technology covered by the '608 Patent without authorization." *Id.*

Aetna replies that caselaw has since developed and many courts have held "that allegations of knowledge alone are not sufficient to state a claim for willful infringement." Def.'s Reply at 9 (quoting Order on Mot. to Dismiss, *Document Sec. Sys., Inv. V. Nichia Corp.*, No. CV 19-098172 JVS (JEMx) at 4–5 (C.D. Cal. Mar. 4, 2020)). In its view, "AlexSam does not even allege garden-variety infringement, much less an 'egregious case[] of culpable behavior' to warrant damages." *Id.* at 10 (quoting *Halo*, 136 S. Ct. at 1926).

Because AlexSam's underlying infringement claims will be dismissed, its claim of willful infringement also must be dismissed. In any event, as it has throughout the Second Amended Complaint, AlexSam has plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). On this claim,

AlexSam has failed "to plead either the necessary subjective intent of infringement or egregiousness." *Novartis Vaccines and Diagnostics Inc. v. Regeneron*, 18-cv-2434 (DLC), 2018 WL 5282887, at *3 (S.D.N.Y. October 24, 2018); *see also id.* ("Novartis peppers language that mirrors the standard for willful infringement throughout its [First Amended Complaint]. Novartis's references to these terms cannot alone state a claim for willful infringement.").

Accordingly, AlexSam's claim for willful infringement would have to be dismissed.

### E.  Declaratory Judgment

28 U.S.C. § 2201 provides that federal courts with jurisdiction over a case "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." "[A] district court possesses discretion in deciding whether to entertain a declaratory judgment action." *Gianni Sports Ltd. v. Metallica*, No. 00 Civ. 0937 (MBM), 2000 WL 1773511, at *4 (S.D.N.Y. Dec. 4, 2000) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)).

The Declaratory Judgment Act, of course, is still limited by the other constraints of Article III jurisdiction: there must be a case or controversy that is justiciable. U.S. Const., Art. III § 2; *see also Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) ("As a threshold issue, DJA actions are justiciable only in cases in which an 'actual controversy' exists. The relevant inquiry for this prerequisite is coextensive with the analysis applicable to the 'case or controversy' standard embodied in Article III of the United States Constitution.").

As part of this limitation, a court therefore must determine whether the declaratory judgment action is ripe for review. *See, e.g. Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 &

n.18 (1993) (noting that, because ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction" the court could raise it *sua sponte*). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree" and the courts have generally avoided drawing a bright line rule. *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The Second Circuit requires that "[t]he standard for ripeness in a declaratory judgment action is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (92d Cir. 2005) (quoting *Md. Cas. Co.*, 312 U.S. at 273). District courts must ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id.* at 389.

Aetna argues that AlexSam's declaratory judgment claim is duplicative because (1) "it is duplicative of claims Alex[S]am has pursued in other courts" and "Alex[S]am's declaratory judgment claim is duplicative of the infringement claim that Alex[S]am is pursuing in this case." Def.'s Mem. at 22–23. Specifically, Aetna's liability for infringement of Claim 33 hinges on a factfinder's determination "both that Aetna Inc. practiced Claim 33 and that it was not licensed—leaving nothing more for the Court to declare." *Id.* at 23.

AlexSam argues that it has adequately pled its declaratory judgment claim. Pl.'s Opp'n at 20. AlexSam first notes that Aetna has no claims in this case and the declaratory judgment claim "is the *only* claim in this case currently addressing this issue; [and] Aetna has no asserted claims or affirmative defenses pending." *Id.* at 20–21 (emphasis in original). In its view, the claim is

ripe because "after a decision on the merits, the Parties will know whether Aetna is liable to AlexSam," *id.* at 22; the claim is not duplicative because "the scope of the MasterCard License is far from clearly determined, and whether it provides any coverage to Aetna for its MasterCard Accused Products is equally unclear," and because "Aetna's assertion of being licensed is only a defense to AlexSam's infringement claim, [and] is separate and distinct from the infringement claims," *id.* at 23. AlexSam argues that, ultimately, the declaratory judgment claim "will provide the answer to the question of whether Aetna is liable to AlexSam for its MasterCard Accused Products." *Id.* at 24.

Aetna replies that "'whether Aetna is liable to AlexSam for its MasterCard Accused Products'. . . . is already embedded in Count II of the [Second Amended Complaint], which alleges that Aetna Inc. practiced Claim 33 'without authority and/or license . . . .'" Def.'s Reply at 4 (quoting Pl.'s Opp'n at 24; SAC ¶ 143).

The Court agrees.

"To find a suit duplicative '[t]here must be the same parties, or at least, such as represent the same interests; there must be the same right asserted and the same relief do not significantly differ between the two actions." *Oliphant v. State of Conn. Dep't of Transp.*, 2004 WL 3249237, at *5 (D. Conn. Aug. 25, 2004) (quoting *Watson v. Jones*, 80 U.S. 679, 715 (1871) (alteration in original)). "For a second action to be duplicative, it is not necessary that the parties be identical." *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 664 (S.D.N.Y. 1997). AlexSam seeks declaratory judgment on claims and issues that will be resolved as this case proceeds.

Accordingly, the Court will dismiss AlexSam's declaratory judgment claims. *See U.S. Bank Nat'l Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, Nos. 12 Civ. 6811 (CM) (JC), 13 Civ. 1580 (CM) (JCF), 2014 WL 998358, at *5 (S.D.N.Y. Mar. 14, 2014) (dismissing a

claim of the implied covenant of good faith and fair dealing where the majority of the allegations were "duplicative of [a] breach of contract claim"); *Burgeson v. Downing*, 2009 WL 185593, at *1 (D. Conn. Jan. 22, 2009) ("Declaratory relief is not intended to provide plaintiff 'a second cause of action for the determination of identical issues.'" (quoting *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 466–67 (S.D.N.Y. 2006)); *cf. Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 124 (S.D.N.Y. 2016) ("In New York, duplicative claims arise from the same facts and allege the same damages." (citation omitted)).

### F.  Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure provides that parties may either amend once as a matter of course or, once the period has elapsed, move for leave to file an amended complaint. Fed. R. Civ. P. 15(a). Parties who fail to file an amended complaint within 15(a)(1)'s time period, or who seek additional amendments, may seek the consent of their opposing party of the court's leave to amend. Fed. R. Civ. P. 15(a)(2). The "court should freely give leave when justice so requires." *Id.*

The decision to grant leave to amend under Fed. R. Civ. P. 15 is within the discretion of the court, but the court must give some "justifying reason" for denying leave. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Id.*; *see also Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (internal citations omitted)); *Park B. Smith, Inc. v.*

*CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) ("While mere delay, absent a showing of bad faith or undue prejudice, is not enough for a district court to deny leave to amend, the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." (internal quotation marks and citations omitted)).

At the same time, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente*, 310 F.3d at 258; *see also Donovam v. Am. Skandia Life Assurance Corp.*, 217 F.R.D. 325, 325 (S.D.N.Y. 2003) ("Where a proposed amend complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied."), *aff'd*, 96 F. App'x 779 (2d Cir. 2004). "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. To survive such a motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Protegrity Corp. v. AJB Software Design, Inc.*, No. 3:13-cv-01484, 2015 WL 461041, at *1 (D. Conn. Feb. 2, 2015) (citing *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). While factual allegations are accepted as true, a complaint "must offer more than 'labels and conclusion[s],' or 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement.'" *Bentley v. Greensky Trade Credit, LLC*, 156 F. Supp. 3d 274, 283 (D. Conn. 2015) (quoting *Twombly*, 550 U.S. at 55, 557) (second alteration in original).

"Dismissal with prejudice is a harsh sanction." *Igidi v. State of Conn. Dep't of Corr.*, No. 3:13-CV-1338 (RNC), 2015 WL 7428527, at *3 (D. Conn. Nov. 20, 2015); *cf. Neitzke v. Williams*, 490 U.S. 319, 328 (1989) ("When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate, but dismissal on the basis of frivolousness is not."); *Thrall*

*v. Central N. Y. Regional Transp. Auth.*, 399 F. App'x 663, 665 (2d Cir. 2010) ("Rule 41(b) dismissal [is] 'a harsh remedy to be utilized only in extreme situations.'" (alteration in original) (quoting *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001)).

Aetna argues that AlexSam has had "three chances to plead a claim for relief that is plausible on its face." Def.'s Mem. at 40. The Second Amended Complaint "repeat[s] verbatim many of the deficient allegations from its prior complaints." *Id.* Aetna argues, therefore, "[f]urther amendment would be futile, and the dismissal of the Second Amended Complaint should be with prejudice." *Id.* (citing *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978)).

AlexSam responds that, should the Court conclude that it has failed to satisfy pleading standards, it "requests leave to amend its Complaint." Pl.'s Opp'n at 38. It argues that leave to amend would not be futile as any deficiencies could be remedied, *id.* at 39, and has attached a Third Amended Complaint. *Id.*

Aetna replies that "AlexSam should be precluded . . . from filing a Third Amended Complaint." Def.'s Reply at 10.

The Court disagrees.

Although AlexSam's voluminous filings have not amounted to viable claims, the Court has yet to conclude definitively that there would be futility, precluding the filing of one last amended pleading. Indeed, the mere filing of numerous complaints alone is not a basis for denying leave to amend. *Cf. Nalco Co.*, 883 F.3d at 1342 (reversing dismissal of Fourth Amended Complaint and remanding for further proceedings). To the extent that AlexSam can

remedy the deficiencies identified in this ruling, AlexSam may move for leave to file an

amended pleading with any proposed amended pleading attached as an exhibit.[14]


## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

AlexSam may move for leave to file an amended pleading by **October 9, 2020**, to the

extent the deficiencies identified in this ruling can be addressed.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of September, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[14] The Court, however, will grant Aetna's motion to strike the proposed Third Amended Complaint attached to one of AlexSam's filings in a separate ruling. That pleading lacks the benefit and guidance of this decision. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").